*Lawsuit I filed as to the forgery of my name, and documents!*

Alfred Cross
P.O. Box 666
Mount Vernon, Illinois 62864
Phone: (314) 724-5469

**FILED**

*JAN 12 2017*

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
BENTON OFFICE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **ALFRED CROSS,**<br><br>Plaintiff,<br><br>vs.<br><br>**RANDALL NILE IRWIN**, personally and **RANDALL IRWIN d/b/a NVK PROPERTIES, LLC,** personally and as agent for NVK; **PEOPLE'S NATIONAL BANK**, FDIC Regulated Federal Financial Institution; **JEFFERSON COUNTY TITLE COMPANY,** an Illinois Business; **NVK PROPERTIES, LLC,** an Illinois corporation; **MICHAEL HOLTZ,** Partner with Irwin, in their Individually, Official and Collectively capacity, inclusive,<br><br>Defendants. | No: 17-CV-34-JPG-RJD<br><br>**FIRST VERIFIED COMPLAINT**<br><br>1. Breach of Contract;<br>2. Fraudulent Misrepresentation;<br>3. Fraud;<br>4. RESPA Violations;<br>5. Deceptive Business Practices;<br>6. Mortgage Fraud;<br>7. Money Laundering; *Criminal offense*<br>8. Equitable/Collateral Estoppel/Res Judicata;<br>9. Promissory Estoppel<br>10. Quantum Meruit<br>11. Negligence<br>12. Concert of Action<br>13. Declaratory Judgment |

*Bank*

### FIRST VERIFIED COMPLAINT

Plaintiff, **Al Cross**, complains against Defendants, and each of them, as follows:

#### I. JURISDICTION

1. The Plaintiff in this action seeks money damages for violation of his contract rights, privileges and immunities secured under the U.S. Constitution, Article I, Section 10, Clause 1 and Amendments First, Fifth, and Fourteenth Amendments.

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

ALFRED CROSS,

        Plaintiff,

        v.

RANDALL NILE IRWIN, PEOPLES
NATIONAL BANK, JEFFERSON COUNTY
TITLE COMPANY, NVK PROPERTIES,
LLC and MICHAEL HOLTZ,

        Defendant.

Case No. 17-cv-34-JPG-RJD

## JUDGMENT

This matter having come before the Court, and the Court having found it lacks subject matter jurisdiction,

IT IS HEREBY ORDERED AND ADJUDGED that this case is dismissed for lack of jurisdiction.

**JUSTINE FLANAGAN, Acting Clerk of Court**

DATED:  **February 16, 2017**        *s/Tina Gray*, **Deputy Clerk**

**Approved:**    s/ J. Phil Gilbert
            **J. PHIL GILBERT**
            **DISTRICT JUDGE**

*Court*

"Breakdown of Altered/Forgered Documents"

A. This is a real transaction I put together, hotel complex in Mt. Vernon, Illinois, for $2,200,000.00 total, my fee/commission was $200,000.00.

B. I have not been paid! The Bank (National Bank-Peoples) along with the Jefferson Title Co. and Buyer, Randy Irwin, Changed, Altered, Forgered documents, see settlement sheet, No I, 1st column, reflects the $200,000.00 (*), working capital.

C. then, look on settlement, No 2, 1st column, reflects the $214,048.00 (*), where they changed the money amount, they also failed to fill in the second column.

D. Note: The back page on both settlement sheets are the same, they either took the one off the first settlement sheet and/or forgered the Names, Alfred Cross, Peter Patel, on the second settlement sheet. I or Mr. Peter never signed a second settlement sheet, when changes are made, the initial signatures are required, I was advised by attorneys, real estate agents, they can't do this, "illegal."

E. Refer to deposit slip, $225,891.21, was balance, that money was from closing, my fee included.

F. Article is self-explantory, common practice!

"Index"

1. Article on the Bank that forgered
the documents, on the customer
setout in the Article and my papers!

2. The following pages is the documents,
where this bank (Peoples) either did,
or directed the papers to be forgered!

A- 1st Settlement Sheet

B- 2nd Settlement Sheet

C- Deposit Slip

"Etc."

Some papers to clarify what the
Kentucky Issue is about!

Purchase of Real Estate!

1. SETTLEMENT SHEETS!

# THE Original signed by myself
at closing - 2 pages

Note:

High-Lighted PART
WHERE THE #200,000.00
my FEE

SAME BANK seYout in the
NEWSPAPER ARticle, its
A pAttern of criminAl
conduct of this bank!

#1

JEFFERSON COUNTY
# TITLE COMPANY

This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

NAME OF BUYER: NVK Properties, LLC, an Illinois limited liability company

ADDRESS OF BUYER: 1325 West Whittaker Street, P O Box 1418, Salem IL 62881

NAME OF SELLER: MPK Investment, Inc., an Illinois corporation

ADDRESS OF SELLER: 405 South 44th Street, Mt Vernon IL 62864

NAME OF LENDER: Peoples National Bank, N.A.

ADDRESS OF LENDER: 102 Cross Creek Boulevard, Salem IL 62881

PROPERTY LOCATION: 405 South 44th Street, Mt Vernon IL 62881

SETTLEMENT AGENT: JEFFERSON COUNTY TITLE COMPANY, 716 MAIN STREET, P.O BOX 402, MT. VERNON, IL 62864 (618) 242-3212

PLACE OF SETTLEMENT: 716 MAIN STREET, P.O BOX 402, MT. VERNON, IL 62864

SETTLEMENT DATE: 1/16/2015

Original Settlement Sheet

| SUMMARY OF BUYER'S TRANSACTION | | SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| 100. GROSS AMOUNT DUE FROM BUYER | | 400. GROSS AMOUNT DUE TO SELLER | 2,100,000.00 |
| 101. Contract sales price | 2,100,000.00 | 401. Contract sales price | 100,000.00 |
| 102. Personal property | 100,000.00 | 402. Personal property | |
| 103. Buyer's Expenses from pg. 2, line 1400 | 14,048.00 | 403. | |
| 104. Permanent working capital | 200,000.00 | 404. | |
| 105. | | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106. City/town taxes to | | 406. City/town taxes to | |
| 107. County taxes to | | 407. County taxes to | |
| 108. Assessments to | | 408. Assessments to | |
| 109. to | | 409. to | |
| 110. to | | 410. to | |
| 111. to | | 411. to | |
| 112. to | | 412. | 2,200,000.00 |
| 120. GROSS AMOUNT DUE FROM BUYER | 2,414,048.00 | 420. GROSS AMOUNT DUE TO SELLER | |
| 200. AMOUNTS PAID BY OR IN BEHALF OF BUYER | | 500. REDUCTIONS IN AMOUNT DUE TO SELLER | |
| 201. Deposit or earnest money | 50,000.00 | 501. Excess deposit (see instructions) | 11,853.00 |
| 202. Principal amount of new loan(s) | 2,414,002.00 | 502. Settlement charges to seller(line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | 552,861.71 |
| 204. | | 504. Payoff of first mortgage loan Community First Bank of the Heartland | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. Principal amount of seller financing | 975.59 |
| 207. Principal amount of seller financing | 975.59 | 507. Restaurant & Lounge & Services - Proration | 6,511.94 |
| 208. Restaurant & Lounge & Services - Proration | | 508. Note Payoff to Community First Bank | 4,200.00 |
| 209. | 4,200.00 | 509. Cash security deposit / Permitted Lease | |
| 209a. Cash security deposit / Permitted Lease | | 509a 2013 RE Taxes $37,339.30 POCS | |
| 209b. | | 509b | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City/town taxes to | | 510. City/town taxes 1/1/2015 to 1/16/2015 | 1,636.80 |
| 211. County taxes 1/1/2015 to 1/16/2015 | 1,636.80 | 511. County taxes to | |
| 212. Assessments to | | 512. Assessments to | |
| 213. to | | 513. 1/1/2014 to 12/31/2014 | 37,339.30 |
| 214. 2014 RE Taxes 1/1/2014 to 12/31/2014 | 37,339.30 | 514. 2014 RE Taxes to | |
| 215. to | | 515. to | |
| 216. to | | 516. to | |
| 217. to | | 517. to | |
| 218. to | | 518. to | |
| 219. to | | 519. | 615,378.34 |
| 220. TOTAL AMOUNTS PAID BY OR IN BEHALF OF BUYER | 2,508,153.69 | 520. TOTAL REDUCTIONS IN AMOUNT DUE SELLER | |
| 300. CASH AT SETTLEMENT FROM/TO BUYER | | 600. CASH AT SETTLEMENT TO/FROM SELLER | 2,200,000.00 |
| 301. Gross amount due from buyer (line 120) | 2,414,048.00 | 601. Gross amount due to seller (line 420) | 615,378.34 |
| 302. Less amounts paid by/for buyer (line 220) | 2,508,153.69 | 602. Less reductions in amount due seller (line 520) | 1,584,621.66 |
| 303. CASH ☐ From ☒ To BUYER | 94,105.69 | 603. CASH ☒ To ☐ From SELLER | |

my fee

1-16-15

716 MAIN STREET
P.O BOX 402
MT. VERNON, IL 62864

Exhibit 2

**Buyer's and Sell...**

| | | BUYER'S EXPENSES | SELLER'S EXPENSES |
|---|---|---|---|
| ...ES BROKER'S COM. based on price 2,100,000.00 and | | | |
| Commission (line 700) as follows: | to | | |
| | to | | |
| ...ssion paid at Settlement | to | | |
| **Items Payable In Connection With Loan** | | | |
| ...an Origination Fee ___ % | to | | |
| Loan Discount ___ % | to Sloan Appraisal & Realty Services | 8,000.00 | |
| Appraisal Fee | to | | |
| Credit Report | to | | |
| Lender's Inspection Fee | to | | |
| 806 Mortgage Insurance Application Fee | to Peoples National Bank NA | 1,000.00 | |
| 807 Document Preparation | to Peoples National Bank NA | 25.00 | |
| 808 Insurance Tracking | to Peoples National Bank NA | 120.00 | |
| 809 Flood Determinations (5) | to Secretary of State | 62.00 | |
| 810 UCC Searches | to | | |
| 811 | to | | |
| 812 | to | | |
| 813 | to | | |
| 814 | to | | |
| 815 | to | | |
| **Items Required By Lender To Be Paid In Advance** | | | |
| 901 Interest from 1/16/2015 to 2/1/2015 @ ___ /day | | | |
| 902 Mortgage Insurance Premium for ___ months to | | | |
| 903 Hazard Insurance Premium for ___ years to | | | |
| 904 ___ years to | | | |
| 905 ___ years to | | | |
| **Reserves Deposited With Lender** | | | |
| 1001 Hazard insurance | months @ per month | | |
| 1002 Mortgage insurance | months @ per month | | |
| 1003 City property taxes | months @ per month | | |
| 1004 County property taxes | months @ per month | | |
| 1005 Annual assessments | months @ per month | | |
| 1006 | months @ per month | | |
| 1007 | months @ per month | | |
| 1008 | | | |
| 1000 | | | |
| **Title Charges** | | 200.00 | 200.00 |
| 1101 Settlement or closing fee | to Jefferson County Title Co LLC | | |
| 1102 Abstract or title search | to | | |
| 1103 Title examination | to | | |
| 1104 Title insurance binder | to | | |
| 1105 Document preparation | to | | |
| 1106 Notary fees | to | | |
| 1107 Attorney's fees | to POC | | |
| includes above items numbers: | to Jefferson County Title Co LLC | 1,508.00 | 3,450.00 |
| 1108 Title insurance | | | |
| includes above items numbers: 1102 1103 1104 & 1105 | INS AMT: 2,414,002.00 | | |
| 1109 Lender's Coverage 1,508.00 | INS AMT: 2,100,000.00 | | |
| 1110 Owner's Coverage 3,450.00 | | | |
| | to Jefferson County Title Co LLC | 6.00 | |
| 1111 State Policy Fee | to Old Republic National Title Ins. Co | 50.00 | 50.00 |
| 1112 CPL | to | | |
| **Government Recording and Transfer Charges** **Includes: Assignment of Rents $55.00** | | 217.00 | |
| 1201 Recording Fees: Deed $46.00; L-Mortgage(s) $59.00; S-Mortgage(s) $57.00; Releases | | | 1,050.00 |
| 1202 City/county tax/stamps: Deed $1,050.00; L-Mortgage(s) ; S-Mortgage(s) | | 21.00 | 2,100.00 |
| 1203 State tax/stamps: Deed $2,100.00; L-Mortgage(s) ; S-Mortgage(s) Secretary of State | | 46.00 | |
| 1204 Recording UCC Jefferson County Recorder | | | |
| 1205 Recording UCC | | | |
| **Additional Settlement Charges** | | | |
| 1301 Survey | to | | |
| 1302 Pest Inspection | to | | |
| 1303 Roof Inspection | to Chase Environmental Services | 2,700.00 | |
| 1304 Environmental Phase 1 | to Jefferson County Recorder | 46.00 | |
| 1305 Assignment/Lease Memo | to Jefferson County Recorder | 47.00 | |
| 1306 Lease Memo | to Jefferson County Title Co LLC | | 5,000.00 |
| 1307 Funds held by JCT-Estoppel Tenant letter | to | | |
| 1308 | to | | |
| 1309 | | | |
| **1400 Total Settlement Charges** (enter on Buyer line 103, and on Seller line 502, Page 1) | | 14,048.00 | 11,853.00 |

DATE 1/16/2015

CERTIFICATION

...ave carefully reviewed the Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and ...sbursements made on my account or by me in this transaction. I further certify that I have received a copy of this Settlement Statement
...3 Properties, LLC, an Illinois limited liability
...mpany                                                    Buyer          MPK Investment, Inc., an Illinois corporation

By _____   _____ President   Se...

... ...perties, L.L.C., an Illinois limited liability company

                                                     Buyer          By _____   Se...

...5 ... Whittaker Street

                                                                    DATE   1/16/2015

2. SETTLEMENT SHEETS!

\# THE FORGERY, WHERE THEY

took THE back-page off

the Original And Put On

THIS ONE

NOTE:

High-LighTED PART

WHERE NOW it shows AS part

of the Buyers Expenses

This WAS done lATER withOut this
seller And myself's signature
CANNOT be done, without okAy!

# Buyer's and Seller's Combined Closing Statement

## JEFFERSON COUNTY TITLE COMPANY

#2

...m is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. ...arked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the total.

| | |
|---|---|
| BUYER: | NVK Properties, LLC, an Illinois limited liability company |
| ...SS OF BUYER: | 1325 West Whittaker Street<br>P O Box 1418 Salem IL 62881 |
| SELLER: | MPK Investment, Inc., an Illinois corporation |
| ...SS OF SELLER: | 405 South 44th Street Mt Vernon IL 62864 |
| LENDER: | Peoples National Bank, N.A. |
| ...SS OF LENDER: | 102 Cross Creek Boulevard Salem IL 62881 |
| ...Y ...ION: | 405 South 44th Street Mt Vernon IL 62881 |
| ...ENT AGENT: | JEFFERSON COUNTY TITLE COMPANY<br>716 MAIN STREET, P.O BOX 402, MT. VERNON, IL 62864 (618) 242-3212 |
| ...OF SETTLEMENT: | 716 MAIN STREET, P.O BOX 402, MT. VERNON, IL 62864 |
| ...ENT DATE: | 1/16/2015 |

Second Settlement Sheet

Changed

| ...Y OF BUYER'S TRANSACTION | | | | SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|---|---|
| ...MOUNT DUE FROM BUYER | | | | 400. GROSS AMOUNT DUE TO SELLER | |
| ...sales price | | | 2,100,000.00 | 401. Contract sales price | |
| ...property | | | 100,000.00 | 402. Personal property | |
| ...Expenses from pg. 2, line 1400 | | | ☆ 214,048.00 | 403. | |
| | | | | 404. | |
| | | | | 405. | |
| ...ent working capital | | | | Adjustments for items paid by seller in advance | |
| ...nts for items paid by seller in advance | | | | 406. City/town taxes to | |
| ...taxes | to | | | 407. County taxes to | |
| ...axes | to | | | 408. Assessments to | |
| ...ents | to | | | 409. to | |
| | to | | | 410. to | |
| | to | | | 411. to | |
| | to | | | 412. | |
| | to | | | | |
| ...MOUNT DUE FROM BUYER | | ▶ | 2,414,048.00 | 420. GROSS AMOUNT DUE TO SELLER | ▶ |
| | | | | 500. REDUCTIONS IN AMOUNT DUE TO SELLER | |
| ...PAID BY OR IN BEHALF OF BUYER | | | | | |
| ...of earnest money | | | 50,000.00 | 501. Excess deposit (see instructions) | |
| ...amount of new loan(s) | | | 2,414,002.00 | 502. Settlement charges to seller (line 1400) | |
| ...loan(s) taken subject to | | | | 503. Existing loan(s) taken subject to | |
| | | | | 504. Payoff of first mortgage loan | |
| | | | | 505. Payoff of second mortgage loan | |
| | | | | 506. Principal amount of seller financing | |
| ...amount of seller financing | | | 975.54 | 507. | |
| ...nt & Lounge & Services - Proration | | | | 508. | |
| ...urity deposit - Permitted Lease | | | 4,200.00 | 509. | |
| | | | | 509a | |
| | | | | 509b | |
| | | | | Adjustments for items unpaid by seller | |
| ...nts for items unpaid by seller | | | | 510. City/town taxes to | |
| ...taxes | to | | | 511. County taxes to | |
| ...axes | 1/1/2015 to | 1/16/2015 | 1,636.80 | 512. Assessments to | |
| ...nts | to | | | 513. to | |
| | to | | | 514. to | |
| ...Taxes | 1/1/2014 to | 12/31/2014 | 37,339.30 | 515. to | |
| | to | | | 516. to | |
| | to | | | 517. to | |
| | to | | | 518. to | |
| | to | | | 519. | |
| | to | | | 520. TOTAL REDUCTIONS IN AMOUNT DUE SELLER | ▶ |
| ...OUNTS PAID ...BEHALF OF BUYER | | ▶ | 2,508,153.69 | | |
| ...SETTLEMENT FROM/TO BUYER | | | | 600. CASH AT SETTLEMENT TO/FROM SELLER | |
| ...ount due from buyer (line 120) | | | 2,414,048.00 | 601. Gross amount due to seller (line 420) | |
| ...unt paid by/for buyer (line 220) | | | 2,508,153.69 | 602. Less reductions in amount due seller (line 520) | |
| ...From X To BUYER | | ▶ | 94,105.69 | 603. CASH X To From SELLER | ▶ |

They changed after they moved the money

Failed To Fill Out

716 MAIN STREET
P.O BOX 402
MT. VERNON IL 62864

PAGE 2

# Buyer's and Seller's Combined Closing Statement

| | | BUYER'S EXPENSES | SELLER'S EXPENSES |
|---|---|---|---|
| SALES/BROKER'S COM. based on price 2,100,000.00 | | | |
| Division of Commission (line 700) as follows: | to | | |
| | to | | |
| Commission paid at Settlement | to | | |
| **Items Payable In Connection With Loan** | | | |
| Loan Origination Fee % | to | | |
| Loan Discount % | to | | |
| Appraisal Fee | to Sloan Appraisal & Realty Services | 6,000.00 | |
| Credit Report | to | | |
| Lender's Inspection Fee | to | | |
| Mortgage Insurance Application Fee | to | | |
| Document Preparation | to Peoples National Bank NA | 1,000.00 | |
| Insurance Tracking | to Peoples National Bank NA | 25.00 | |
| Flood Determinations (5) | to Peoples National Bank NA | 120.00 | |
| UCC Searches | to Secretary of State | 62.00 | |
| | to | | |
| | to | | |
| | to | | |
| | to | | |
| | to | | |
| **Items Required By Lender To Be Paid In Advance** | | | |
| Interest from 1/16/2015 to 2/1/2015 @ /day | | | |
| Mortgage Insurance Premium for months | to | | |
| Hazard Insurance Premium for years | to | | |
| years | to | | |
| years | to | | |
| **Reserves Deposited With Lender** | | | |
| Hazard insurance | months @ per month | | |
| Mortgage insurance | months @ per month | | |
| City property taxes | months @ per month | | |
| County property taxes | months @ per month | | |
| Annual assessment | months @ per month | | |
| | months @ per month | | |
| | months @ per month | | |
| | months @ per month | | |
| **Title Charges** | | | |
| Settlement or closing fee | to Jefferson County Title Co LLC | 200.00 | 200.00 |
| Abstract or title search | to | | |
| Title examination | to | | |
| Title insurance binder | to | | |
| Document preparation | to | | |
| Notary fees | to POC | | |
| Attorney's fees | to | | |
| (includes above items numbers: | | | |
| Title insurance | to Jefferson County Title Co LLC | 1,508.00 | 3,450.00 |
| (includes above items numbers: 1102,1103,1104 & 1105 | | | |
| Lender's Coverage: 1,508.00 | INS AMT: 2,414,002.00 | | |
| Owner's Coverage: 3,450.00 | INS AMT: 2,100,000.00 | | |
| | to Jefferson County Title Co LLC | 6.00 | 5.00 |
| State Policy Fee | to Old Republic National Title Ins. Co | 50.00 | 50.00 |
| | to | | |
| **Government Recording and Transfer Charges** | **Includes: Assignment of Rents $55.00 | | |
| Recording Fees: Deed $46.00; L-Mortgage(s) $59.00; S-Mortgage(s) $57.00; Releases | | 217.00 | |
| City/county tax/stamps: Deed $1,050.00; L-Mortgage(s) ; S-Mortgage(s) | | | 1,050.00 |
| State tax/stamps: Deed $2,100.00; L-Mortgage(s) ; S-Mortgage(s) | | | 2,100.00 |
| Recording UCC | Secretary of State | 21.00 | |
| Recording UCC | Jefferson County Recorder | 46.00 | |
| **Additional Settlement Charges** | | | |
| Survey | to | | |
| Pest Inspection | to | | |
| Inspection | to | | |
| Environmental Phase 1 | to Chase Environmental Services | 2,700.00 | |
| Assignment Lease Memo | to Jefferson County Recorder | 46.00 | |
| Lease Memo | to Jefferson County Recorder | 47.00 | |
| Funds held by JCT-Estoppel Tenant letter | to Jefferson County Title Co LLC | | 5,000.00 |
| | to | | |
| | to | | |
| **Total Settlement Charges** (enter on Buyer line 103, and on Seller line 502, Page 1) | | 14,048.00 | 11,853.00 |

CERTIFICATION

DATE 1/16/2015

I have carefully reviewed this Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of this Settlement Statement.

[illegible] LLC an Illinois limited liability company — Buyer

MPE Investment, Inc., an Illinois corporation — Seller

[illegible] LLC, an Illinois limited liability company — Buyer

Seller

Same back page

As Filed

Deposit Slip!

Shows balance #225,891.21

#200,000.00 to be paid to me!

Note:

The explanation setsout
the facts!

They moved that money for
other purpose
moved to Florida, it was
designated in mortgage
papers for Mt. Vernon

# BANK on the GO!

Download the PNB **2go** app to your smartphone or tablet today!



**PEOPLES** NATIONAL BANK

FR:177 2-211      02/02/15   03:12 PM
KXXXX6562 Ck Deposit      13,862.30
                    ANN

*Al Your Banking with PNB2GO!* **225.891.21**

All items received subject to conditions and terms stated on signature cards currently used. The deposit is accepted subject also to verification by the bank's proof department.

**MEMBER FDIC**
DEPOSITS MAY NOT BE AVAILABLE FOR EARLY WITHDRAWAL.

*$200,000.00 of this
was to be paid to me!
It disappeared.*

1. We closed on 1/16/15, this was in bank account, $200,000.00, was my fee, Irwin and the bank moved it. This was designated on settlement sheet as working capital, cannot be used for anything else outside designated for on sheet and mortgage documents.

2. Illinois State Police, fraud investigators stated, the teller shouldn't even gave me this deposit slip as I was not on the account, that is questionable on the part of the bank! They investigated other illegal acts.

3. The teller later told me that money had been moved!

4. This branch, and the Salem Branch, namely Brian Ganster, Branch Manager, is the individual who directed all the alter/forgering documents.

5. A Banker, I know, told me that bank had to authorize any change on a settlement sheet, further, any new documents, changes, MUST, be signed by the initial individuals, that didn't happen!

Summary:

Those settlement sheets were in violation of the law, in this instance, a federal crime!

NEWSPAPER ARTICLE!

Self-Explantory, As to
criminal activity,

SAME bank that FORGERED
THE seTTlement sheets!

Note

This Bank is the same Bank in the event Branch that Altered/Forged/Tampered the settlement sheets they make practice of Altering/Forging documents.!

# Register-News

Vol. 99   No. 216

**Today**

88 / 72

**WEATHER**
Isolated storms

**Tuesday, August 2, 2016**

**WE ARE MT. VERNON**

Buescher emerges for 1st Cup win.

Sports, Page 1B

www.register-news.com

75 cents

## Peoples Bank cited $16.3M

Jackson County court judgement entered against local bank

**TESA GLASS**
c.glass@register-news.com

JACKSON COUNTY — Final judgement has been made against Peoples National Bank

in excess of $16.3 million.

The 14-year-old case involved Robert and Terry Newman, former owners of eight Taco Johns locations throughout Southern Illinois, and the subsequent sale of the franchise.

In the judgement, Judge Christy Solverson used terms such as "egregious," "intentional," "repeated," "fraudulent" and "misappropriation of funds" in describing the actions of the bank in the case.

According to court records, the Newman's entered into an agreement with Amigos Food Services LLC on March 6, 2001, for the sale of stock in the eight franchises in Southern Illinois. Amigo agreed to pay the Newman's $270,000 and assume about $4 million in debt owed to Peoples National Bank, including a portion which had been guaranteed by the U.S. Small Business Administration. Amigo further agreed to

provide a $150,000 letter of credit in favor of the bank and the Newman's.

"In addition, and critical to this Court's decision, under the March 27, 2001, Undertaking of Parties, Amigo agreed that it would 'pledge as security for the faithful performance of their obligations the shares of stock...and execute such Pledge Agreement necessary and convenient for sellers to obtain the management, con-

trol and ownership of the corporation and its assets in the event of default by buyers.'"

The pledge agreement provided that if Amigos defaulted on any of its principal or interest payments, they would "return all shares to the Newman's) immediately without any delay..."

The Newman's, all Amigos owners and the bank, by its

**SEE BANK PAGE 3A**

11   |   Taking the tour   |   NEWS

*ture and signed into law* | *is always a priority of* | *expiration date.* | *employees and three* | *too and can damage the* | *this."*

# BANK

## Peoples Bank cited $16.3M

### FROM PAGE 1A

vice president Chad Curd, executed the agreement. The sale was closed on April 1, 2001. The Newman's received $270,000 cash, Peoples and the Newman's received the letter of credit for $150,000 and all but 1,000 shares of stock were transferred to Amigo. The remaining 1,000 shares of stock were placed in escrow with Peoples as agreed in the Pledge Agreement.

An Assumption Agreement was executed on Aug. 23, 2001 with Amigo, the Illinois Small Business Growth Corporation and U.S. Small Business Administration, which listed the Newman's as guarantors on two debts — $230,000 and a loan with a principal balance of $824,000. The Newman's didn't have any knowledge of the agreement, and were not listed as parties to the agreement or sign the agreement, court documents state.

Sometime in 2012, the Newman's found out about a document called "Consent to Assumption of Loan" which allegedly was signed at about the

tion Agreement.

"This Court finds that neither Robert Newman nor Terry Newman signed said document nor did they agree to remain as guarantors of any SBA indebtedness," the judgement states. "...The Newman's did enter into an agreement with PNB (on Oct. 116, 2001) ... PNB agreed 'to remove the Newman's individually and any enterprise or affiliate of the Newman's from any and all debt arising from the Taco John's stores and the sale of the stores to Amigo held by the Bank."

The Newman's also received several assurances from the bank's Executive Vice President Joe David Cummins, that they had been released from any and all liability, with the exception of the $230,330 note."

The court determined the Newman's had been released as guarantors, and "the Assumption Agreement...is a forgery or an otherwise fraudulently credited document."

Cummins is no longer associated with Peoples National Bank.

Court documents show Amigos first defaulted on the SBA in November or December 2001, but "the record is clear that Amigo first defaulted on the $230,330 note by their failure to make any payment of any kind in April of 2002. ... The record ... is clear that Amigo made no

cipal at any time after March 27, 2002, and had defaulted on the note."

Amigo had four total loans, three owed to Peoples.National Bank, and between April 2002 and October 2002, Amigo had defaulted on the three notes due and payable.

"The total of all indebtedness associated with the Taco Johns stores outstanding as of Oct. 28, 2001, equaled $4,053,390.28 which included $3,243,892.05 on the three loans to PNB with principal, interest and late fees ... and the $809,498.23 balance due under the SBA 504 loan..."

The bank knew of the default before the end of April 2002, and "the Bank violated its fiduciary duty to the Newman's when it began making transfers from the Line of Credit at issue for its sole and exclusive benefit," the judgement states.

"Robert Newman and Terry Newman never received notice from the Bank of a default by Amigo on its obligations under the Undertaking of the Parties or Pledge Agreement," the judgement further states. "Further, the Newman's received no notice from the Bank of the Bank's application of the Letter of Credit proceeds to indebtedness owed the

Bank by Amigo."

The Newman's first learned of the default around Oct. 25, 2002, when they received a letter from an attorney notifying them Amigo had not made lease payments and the 2001 property tax bill was not paid — a total of $9,878.12.

"The Newman's made numerous inquiries of PNB concerning the status of Amigo on their obligations under the parties' agreements," the judgement states. "... The Newman's traveled from Herrin to Mt. Vernon on three occasions to make personal inquiries of bank staff. On each of those occasions and in phone calls directed at both the Newman's and their counsel, the Bank refused to provide information to the Newman's concerning the status of Amigo with regard to the payments on debt obligations associated with the Taco John's franchises"

The judgement states Peoples Bank had a duty to disclose the default and "breached its duty by failing to act affirmatively to provide notice, by its refusal to provide information to the Newman's despite their repeated requests, and by its application of the Line of Credit for the sole benefit of the Bank."

The Newman's would

have exercised their rights to take back all stock and operational control of the eight restaurants, had the bank made the notification.

"The $150,000 Letter of Credit naming the Bank and the Newman's as beneficiaries would have been more than sufficient to have paid all outstanding interest and late charges and would have been sufficient to have brought all of Amigo's debt current, had it been properly applied by the bank," the judgement states.

The judgement states the case warrants punitive damages, as well as compensatory damages as well as emotional distress.

"The Bank's conduct was intentional and repeated and perpetrated with knowledge of the likely and significant harm that would befall the Newman's," the judgement states. "The bank also had knowledge of the Newman's financial circumstances and of Amigo's performance under the terms of the agreements at issue. It

clearly had knowledge that the application of the Line of Credit for its sole benefit would be to the detriment of the Newman's. Despite that knowledge and the primary duty required of a fiduciary, the bank engaged in a pattern of violations in breach of its duty ... The intentional, repeated and knowing nature of the bank's conduct is the proximate cause of both financial and emotional distress injuries suffered by the Newman's."

The court judgement orders Peoples to pay $1,650,000 in lost profits, $2,885,245 in lost income, $1,727,802 in lost equity and $280,000 in emotional distress for a total of $6,543,047 in compensatory damages to the Newman's, and another $9,814,570 in punitive damages which include attorney's fees, for a total of $16,357,618.

Case went to the Fifth Appellate Court prior to the judgement. The Appellate Court upheld the facts presented in the case.

CARING FOR OUR COMMUNITY



JOE'S PIZZA

**Pizza & Italian Restaurant**

**LUNCH SPECIAL**
Daily Pasta Special — $6^67
with Bread & Drink

8" 2 Topping Pizza — $7^06
with Salad & Drink

Appetizers • Salads • Pizza • Pasta • Subs

7/3/2017    Civil lawsuit accuses Peoples National Bank and its leaders of racketeering, fraud | Local News | thesouthern.com

Case 3:17-cr-30047-NJR   Document 46-1   Filed 10/24/17   Page 22 of 50   Page ID #177

*This is the same bank, different Branch that was involved in the movies, owed me, they make a common practice of illegal activities/criminal actions!*

http://thesouthern.com/news/local/civil-lawsuit-accuses-peoples-national-bank-and-its-leaders-of/article_415e77ba-3610-5346-ae09-514b743490e3.html

# Civil lawsuit accuses Peoples National Bank and its leaders of racketeering, fraud

MOLLY PARKER THE SOUTHERN   Mar 19, 2017



Bonan II

GRAND CHAIN — A brewing feud between two longstanding Southern Illinois banks has gone public.

*Federal Case: Judge Gilbert*
*3:17-cv-00266-SMY-SCW*

In a lawsuit filed this past week in federal court, Grand Rivers Community Bank accuses Peoples National Bank and its leaders of usurping control of Grand Rivers for racketeering activities from August 2010 through the present time to the detriment of Grand Rivers.

The lawsuit accuses Peoples and its leaders of "rampant self-dealing, preferential transactions, and improper transfer of low-quality assets from Peoples to Grand Rivers." It further alleges that Peoples sought to acquire Grand Rivers in August 2015 for the purpose of concealing those activities.

7/3/2017     Civil lawsuit accuses Peoples National Bank and its leaders of racketeering, fraud | Local News | thesouthern.com

Case 3:17-cr-30047-NJR   Document 46-1   Filed 10/24/17   Page 23 of 50   Page ID #178

On Friday, a representative of Peoples National Bank's corporate office in Mount Vernon, said the bank and the defendants named in the lawsuit had no comment at this time on the allegations made against them in the 61-page filing.

Grand Rivers claims it only became aware of the illegal activities it alleges after the merger was finalized on Nov. 27, 2015.

Therefore, Grand Rivers claims that based on its allegations of Peoples "fraudulent concealment of the true purpose of the agreement," that the merger agreement "is based entirely on fraud and is void." The lawsuit also alleges that the board of directors of Grand Rivers was illegally constituted at the time of the merger, in violation of Illinois law and Grand Rivers' bylaws.

The lawsuit specifically accuses Frank William Bonan II, former chairman of the Grand Rivers Community Bank and a current director of Peoples, of using the bank "as a personal account from which he could borrow unlimited amounts of money." Collectively, the defendants are accused of infiltrating Grand Rivers and its sole shareholder, Main Street Bancshares Inc., and managing them "for their own illegal purposes."

Named as defendants in the lawsuit brought by Grand Rivers and Main Street are:

• Peoples National Bank;

• Peoples' sole shareholder, Market Street Bancshares;

• Bonan II, of Harrisburg, who also formerly served as Peoples' president of the Southern Illinois District;

• his father, Frank William Bonan, of Mount Vernon, the chairman, president and general counsel of Peoples and vice chairman of Market Street;

• and Keith Botsch, of Carmi, a former member of Grand Rivers' Executive Committee, a CPA who does accounting work for Grand Rivers, and a current director of Market Street and Peoples.

## Key components of the case

The lawsuit's chief accusations are as follows:

• In 2010, Bonan II and Botsch came to constitute a majority of Grand Rivers' three-member Executive Committee, which is charged with approving all loans. Many of the loans made while Bonan II and Botsch were controlling members benefited their insiders, Bonan II's family members and friends, or one of five separate business entities controlled by Bonan II, it is alleged.

The lawsuit does not name those business entities, but a search of online newspaper archives and government records shows Bonan II is a key member of businesses dealing with real estate, group health insurance and video gaming parlors located in 11 Southern Illinois communities called Nikki's Place.

*[handwritten: This was of concern of Palmers gaming]*

According to the lawsuit, Bonan II and Botsch did not disclose the substantial nature of certain loan transactions to Main Street, Grand Rivers, or the third independent member of the executive committee. "When questions were raised as to the quality of these transactions, Bonan II exercised dominant control to further the scheme."

• Market Street and Peoples asserted control over and indirect ownership of Main Street and Grand Rivers without the required approval of the Federal Reserve, it is alleged.

• On June 29, 2012, Grand Rivers extended three loans totaling $1.47 million to family members of a shareholder, director, and a Peoples insider, the lawsuit alleges. All three were in their 20s at the time, and none were customers of Grand Rivers. It is alleged that they were straw borrowers in a scheme orchestrated on behalf of Peoples. Non-existent collateral was pledged on these loans.

7/3/2017     Civil lawsuit accuses Peoples National Bank and its leaders of racketeering, fraud | Local News | thesouthern.com

Case 3:17-cr-30047-NJR    Document 46-1    Filed 10/24/17    Page 25 of 50    PageID #180

The loan proceeds were paid from Grand Rivers to Market Street Bancshares (the sole shareholder of Peoples) via wire transfer on July 5, 2012. The lawsuit alleges that on Aug, 9, 2012, Market Street and Peoples used these "illegally obtained funds" to repay the federal government money owned under the Troubled Asset Relief Program. The TARP program was signed into law by President George W. Bush in October 2008 to help banks regain financial stability during the subprime mortgage crisis that sparked the Great Recession.

• It is alleged that Peoples bank routinely used Grand Rivers to serve as a refinancing source for Peoples' high-risk loans, in order to improve Peoples' balance sheet. The troubled loans inappropriately refinanced by Grand Rivers total about $10 million, accounting for about 21 percent of Grand Rivers' entire loan portfolio, it is alleged.

In one such case, it is alleged that Grand Rivers Credit Analyst Don Nave was instructed by Bonan II to extend credit to a borrower Nave had flagged as a substandard credit risk. The refinancing deal exposed Grand River by more than $1.26 million on behalf of a borrower that was continuing to experience cash flow issues, the lawsuit claims.

After Nave expressed his concerns, Bonan II responded, "Are you asking if I give a s--- Don? You have no idea what is going on. If you would like to know please let me know. You guys work on this loan or pack your s--- and get out," according to an email exchange included in the lawsuit. That same day, Grady Gaskins, the bank's CFO, submitted the restructured loan for approval to the executive committee, which signed off on it. "The loan remains unpaid, and has caused Grand Rivers to suffer loses," the lawsuit states.

## 'Rampant self-dealing' alleged

Bonan II is accused in the lawsuit of personally engaging in a pattern of self-dealing to benefit himself, his family members and friends, and a romantic partner. The lawsuit alleges Bonan II sent an email June 7, 2015, to CFO Gaskins and others stating, "I need to get my gross income up to $250,000 per month very soon. We will go over cash flow so everyone will know how than [sic] contribute. Remember the deal. The more money the business makes the more money you guys make. I have always done this and will continue to do this."

The lawsuit details allegations of lines of credit issued at the direction of Bonan II, to benefit friends of his and businesses with which he is associated.

The lawsuit claims that a substantial part of a $1.325 million loan was used to purchase an apartment building for a company Bonan II is involved with. And a $300,000 loan, obtained through a <u>straw borrower,</u> was used as a down payment on a building purchased by a company owned and controlled by Bonan II and Botsch, Grand Rivers' CPA, it is alleged.

It is further alleged that at Bonan II's direction, Grand Rivers extended loans to another company with which he is involved in the amount of $1.262 million. The loan was guaranteed by two individuals with extremely limited financial capacity, one of which had a net negative worth, and whom were employed by Bonan II in his other activities, the lawsuit alleges.

A portion of the money — about $358,000 — was used to refinance a mortgage loan owed to Peoples National Bank by another company whose managing members were friends of Bonan II's, one of whom it is believed he was engaged in a romantic relationship with at the time, the lawsuit alleges.

## Merger called into question

As to the merger agreement, the lawsuit alleges that on or about July 12, 2015, Botsch, the CPA, contacted Bonan (Bonan II's father) regarding Botsch's <u>knowledge of Bonan II's improper activities related to Grand Rivers,</u> and "<u>expressed in words or substance that, unless Bonan I were to do something about it, Bonan II would go to prison.</u>"

On Aug. 20, 2015, Gaskins sent an email to Bonan II at his Peoples email address with the subject "PLAN" that outlined the intended terms of the acquisition of Grand Rivers by Market Street and Peoples. On Aug. 24, 2015, Market Street, at the direction of the elder Bonan, its chairman, entered into a letter of intent to acquire the outstanding stock of Grand Rivers. Bonan II executed the letter of intent on behalf of Grand Rivers. On Oct. 20, 2015, Bonan II abruptly resigned from the Grand Rivers Board of Directors, the lawsuit claims.

The day after his resignation, in a telephone conversation with Grand Rivers CEO Whitney Stringer, Bonan II said he would consider reinstating himself as chairman of the board to get the merger on track, but advised that CEO Stringer would need to speak with the elder

Bonan to determine whether the merger was going forward. On Oct. 21, 2015, Bonan confirmed that Market Street would go forward with the acquisition if Botsch, the CPA, resigned from the board, according allegations in the lawsuit.

That same day, Bonan II advised CEO Stringer that, for the merger to proceed, everyone except for board member Jake Campbell would have to resign; Bonan II would be able to choose his own board, and he would be paid $10,000 per month as chairman.

He stated his demands must be met by 4 p.m. Main Street and Grand Rivers went along with the deal, claiming in the lawsuit they did so because they were "unaware of the self-dealing, preferential transactions, and transfer of low-quality assets" directed by Bonan II to the detriment of Grand Rivers, and at the time desired to go forward with the merger. Under the terms of the deal, Bonan II then named to the board himself, CEO Stringer, CFO Gaskins, Campbell, a prior board member, and Luke Phelps, a business insurance agent from Eldorado and the son of former Congressman David Phelps.

• The lawsuit claims that Bonan II inappropriately controlled the election of the majority of directors of Main Street when making the above directive on Oct. 21, 2015, regarding constitution of the board. It is alleged that Bonan II purported to serve as chairman, but was neither appointed nor elected as required by Illinois law or the Grand Rivers' bylaws. Citing the alleged improper constitution of the board and alleged concealment of fraudulent acts including racketeering, Grand Rivers claims the merger should be voided.

• The plaintiffs additionally seek compensatory and punitive damages and attorneys' fees, all to be determined in a trial.

The lawsuit was filed Tuesday in the U.S. District Court for the Southern District of Illinois. It was originally assigned to Judge Phil Gilbert, but court records filed Wednesday show he has recused himself, and the case has been reassigned to Judge Staci Yandle.

## Lawsuit alleges RICO violations

*Same Judge on my case against Peoples Bank! He didn't recuse himself*

The lawsuit alleges five counts of civil violations of the Racketeer Influenced and Corrupt Organizations Act, more commonly known to by its acronym, RICO. The 1970 RICO Act allows for both civil claims and criminal charges to be brought against alleged violators. To date, the newspaper is not aware of any federal criminal charges brought against the defendants as it relates to the allegations of racketeering outlined in the civil lawsuit.

The lawsuit additionally alleges financial institution fraud, breach of fiduciary duty and two counts of fraud. *Same thing in the case in Jackson City!*

## About Peoples Bank

Peoples Bank, headquartered in Mount Vernon, is one of the largest locally owned and controlled banks in Southern Illinois. Its roots date back to 1893, when a private firm called Peoples Bank was founded in McLeansboro. It was chartered as a national bank in 1909, according to the bank's website. In 1988, shareholders Bill Bonan and Hunt Bonan — Bonan II's father and uncle, respectively — formed a bank holding company, Market Street Bancshares, Inc., for the purpose of acquiring 100 percent of the stock of Peoples.

Peoples, under the Bonan family's leadership, has enjoyed much success over the years and currently has Illinois branches in West City, Benton, Carmi, Carterville, Centralia, Dahlgren, Eldorado, Equality, Fairfield, Harrisburg, Herrin, Marion, McLeansboro, Mount Vernon, Salem and West Frankfort, in addition to branches in the Missouri cities of St. Louis and Clayton.

The Bonans have been active in both charity and politics in the region and state.

Combined, Bonan, Bonan II, Hunt Bonan, Market Street Bancshares and other companies affiliated with the Bonans have given tens of thousands of dollars in campaign donations to political candidates on both sides of the aisle. The family was among the largest financial supporters of former Gov. Rod Blagojevich.

During the Blagojevich administration, Hunt Bonan served as chairman of the Board of Review of the Illinois Department of Employment Security, and Bonan II was appointed by Blagojevich to serve on the SIU Board of Trustees, of which he was a member from October 2008 to April 2011.

More recently, the Bonans financially supported the campaigns of Dale Fowler, who is employed as the Southern Illinois business development officer for Peoples, in his successful 2015 run for mayor of Harrisburg and 2016 bid for the state senate. Fowler, R-Harrisburg, toppled longtime Democratic Sen. Gary Forby, D-Benton in a surprise upset this November. Combined, the Bonans, individually and through companies with which they are associated, gave $47,500 since 2015 to Fowler's campaign accounts for mayor and state senator. The elder Bonan and Fowler are co-founders of the nonprofit Fowler-Bonan Foundation that provides clothing and shoes to children in need, and Bonan II serves on the charity's board. *only good thing they done*

The Bonans have also given smaller amounts to other politicians, including recently Republicans Rep. Terri Bryant, Sen. Paul Schimpf, and Leslie Munger, who lost a bid for Illinois comptroller in November, as well as Democrats that include Williamson County State's Attorney Brandon Zanotti, and Judge Jo Beth Weber, who lost her judicial race in November for the 5th District Appellate Court.

In August 2016, Peoples made headlines after a Jackson County Circuit Court Judge rendered a judgment against the bank in excess of $16 million, most of which was to be paid to two Herrin brothers who said the bank's fraudulent activities caused them to lose their Taco John's franchise in Southern Illinois. *Joe David Cummins did this, now is with Community Trust - Mt. Vernon*

In their lawsuit, Robert and Terry Newman accused Peoples, their longtime financial institution, of illegally converting their assets, forging documents that left them on the hook for hundreds of thousands of dollars in indebtedness, and failing to provide reasonable and honest communication to clients whom they had a fiduciary responsibility, resulting in the Newmans losing rights to reclaim their business when the party they sold to defaulted on its loans. At the time, Peoples said it planned to appeal the decision.

## About Grand Rivers

Grand Rivers Community Bank is a much smaller operation in business scope and influence. Peoples is a nationally chartered member of the Federal Reserve System, where Grand Rivers is a state-chartered bank.

Grand Rivers has roots in Pulaski County dating back to 1902, with current branch locations in Grand Chain, its headquarters, Karnak and Shawneetown. The bank had apparent financial struggles before 2010, the year Bonan II is alleged to have begun his

7/3/2017 Civil lawsuit accuses Peoples National Bank and its leaders of racketeering, fraud | Local News | thesouthern.com

Case 3:17-cr-30047-RJR Document 46-1 Filed 10/24/17 Page 30 of 50 Page ID #185

reign of undue influence over Grand Rivers.

In 2009, Grand Rivers entered into a consent decree with the Federal Deposit Insurance Corp. and the Illinois Department of Professional and Financial Regulation to correct unsafe or unsound bank practices alleged to have been committed by the bank. The bank entered into the consent decree, which called for corrective business and management practices, without either denying or admitting to the claims that caused regulators to flag the bank and issue a cease and desist order.

It was one of 55 Illinois banks that state regulators issued enforcement against in 2009, at the height of the recession, as many financial institutions struggled.

The order was terminated on Aug. 15, 2011.

Grand Rivers entered into a second consent order with state's regulatory arm on May 24, 2016. Again, the bank did not admit to or deny the allegations of unsafe and unsound banking practices alleged by state regulators that led to the enforcement action. The standard language consent order calls for the rapid hiring of a skilled financial manager and greater board participation and oversight to ensure sound financial practices.

In 2016, Grand Rivers was one of only six banks state financial regulators issued enforcement action against. The consent order remains in effect.

*Under the control of Bonan Family!*

molly.parker@thesouthern.com

618-351-5079

On Twitter: @MollyParkerSI

---

Molly Parker

Molly Parker is general assignment and investigative projects reporter for The Southern Illinoisan.

*700 N. Illinois
Carbondale, Ill. 62901*

*THESE WERE AND a still pending a civil action
on this matter in state court.*

# FACT SHEET FOR AL CROSS TO FEDERAL DEFENDER

Defendant Alfred Cross (hereafter "Cross") is a private, individual person whom acts on behalf of others to buy and sell property and negotiate real estate in exchange for a commission. Plaintiff acts in his own behalf, or as an independent agent for those he intervenes for to negotiate real estate transactions, do consulting, management, or help acquire financing for parties in trouble or needing help, usually from California lenders.

Defendant Cross has operated through a company called Giant Hospitality Group, with Offices out of California and Illinois, doing business since 1982 and which deals national; he has helped companies like: ___ *VARIOUS COMPANIES/etc.* ___
___ *Throughout United States* ___
_____.

This is in regards to a contractual agreement between Defendant Alfred Cross, and Plaintiff Randall Irwin, of 333 South 42th Street, Mount Vernon, Illinois 62864, for the purpose of Defendant rendering service in assisting Defendant Randall Irwin in the capacity of a "Private Real Estate Negotiator" in purchasing the America's Best Value Inn from the Patels, now called the Affordable Inn, at 405 South 44th Street, Mount Vernon, Illinois 62864.

Starting back on or around April 2014, Randall Irwin approached Defendant Cross to help him purchase the America's Best Value Inn motel from Pete Patel and his brother Victor. They were asking a price of $3,200,000.00 for the property. After negotiations, Defendant brought them to an amount of $2,500,000.00 for the property.

Plaintiff Cross agreed to act as a negotiator, consultant and advisor in exchange for $50,000.00 commission and started these negotiations as an independent agent acting on behalf

of Randall Irwin and NVK on or around May 4, 2014. Victor Patel was to pay a $200,000.00 commission off the sale.

Victor Patel informed Defendant if he did not have to pay any commission, he would bring the price down to $2,200,000.00. Defendant took the offer to Plaintiff Randall Irwin, who accepted this offer by assent thereby reverting the commission Defendant would have received from Victor Patel back to Plaintiff Randall Irwin. Plaintiff Randall Irwin did not explain all details to Defendant and was not forthcoming with all the facts in regard to the property purchase. This agreement, with the assent with Victor Patel, was that Randall Irwin would pay Defendant 10% of the sale price of the property (which is Cross' average rate in all transactions). Plaintiff Randall Irwin agreed to these terms.

Plaintiff Randall Irwin informed Defendant Cross he wanted the lower price because "I do not believe I could get anything more or extra because of the ship of the property" than the price of the motel, which is why negotiations were made with Patel to bring the price down to $2,200,00.00.

During this time frame, Cross and Irwin spoke of other possible purchases for Cross, with Cross having some concern. Irwin informed Cross he could insure financing. When asked how, Irwin explained by a "kickback" to the loan officer he would get the loan. Irwin further told Cross that he insured the loan by paying the loan officer $50,000.00. The loan officer is Brian out of Salem People's National Bank. A bank who recently got a $16 million dollar suit and investigation for drug and bank crimes against it.

At the closing, Plaintiff Randall Irwin obtained from Plaintiff People's National Bank of Salem, Illinois $240,000.00 extra from the price for working capital, with the total amount being

$2,440,000.00. Of this price, Defendant was entitled, pursuant to the verbal contractual agreement, and the Purchase and Sale agreement, to 10% or the sum total of $220,000.00; minus $10,000.00 for furniture. Each party normally pays half, but when Plaintiff Randall Irwin agreed to Victor Patel's terms, he also agreed to pay the total commission for finalizing the agreement of $210,000.00. The $50,000.00 was actually dropped this fee, which could have remained, to just the $210,000.00 for fairness.

As negotiator, Defendant Cross benefited Plaintiff Randall Irwin by saving him over $800,000.00 off the property cost. The property of the America's Best Value Inn, now Affordable Inn, is located at: 405 South 44th Street, Mount Vernon, Illinois 62864.

The amount owed for the services Defendant Cross rendered, by verbal and written contract, is 10% of the selling price, or $220,000.00, minus some items Defendant obtained from Plaintiff Irwin, which would be subtracted from this price. The owner, Plaintiff Randall Irwin, operates under the corporation known as NVK Properties, LLC out of, Mount Vernon, Illinois, and MidSouth Property Holdings Inc., out of Salem, Illinois.

The closing of the property occurred on or about January 16, 2015 upon which Defendant Cross signed for Plaintiff Irwin, at his request, a Settlement sheet from Plaintiff Jefferson County Title Company. This was also signed by Peter Patel, and acknowledged by Piercy of the Howard, Leggans, Piercy & Howard Law Firm, at 1008 Main Street, Mount Vernon, Illinois 62864, phone: (618) 242-6594. The Settlement sheet signed by Defendant Cross and Peter Patel at the Plaintiff Jefferson County Title Company stated the following: 1) contract price, $2,100,000.00; 2) personal property: $100,000.00; 3) Buyer's expense, $14,048.00; and 4) Permanent working capital, $200,000.00. It also included in the summary of seller's transactions various quotes of numbers as to figures relating to Plaintiff People's National Bank, and other matters. It is

3

contended Peter Patel's Settlement Sheet would state these same matters. The working capital was for purchase to upgrade the newly acquired motel purchased and pay part of Cross' commission fee.

The bank used a Hud-1 settlement sheet, not the proper form, which required all commissions be stated and finalized at time of closing. Section 700 deals with the commission paid to real estate agents. Lines 701 and 702 show how commissions are split between two participating agencies. The Howard, Leggans, Piercy & Howard Law Firm knew Cross was not a licensed real estate broker and had no complaint of him acting as agent for Irwin and the Patels.

After purchase, the City of Mt. Vernon sought to close the motel due to damage on the 3 and 4th levels; a portion of the 4th level front outer walkway had collapsed and Cross assured the City the 3rd and 4th levels would not be lived in and the walkway would be repaired. Cross, as consultant and advisor also, hired Kevin _____ to format a new section on the 4th floor, which was placed underway and which, afterward, Randall Irwin intervened to pay Kevin more than the contracted work agreed to and allowed cuts, which were to be guaranteed by Kevin on the work.

Defendant Cross is entitled the commission owed him at time of closing. Plaintiff Irwin requested Defendant wait until he finalized the entire property division which Plaintiff Irwin expected to sell in the upcoming future, at which time Defendant was to be paid for my services, or by May 1, 2015 at the latest. Plaintiff Irwin allowed the transactors to back out from a specific performance matter and then claims he does not owe me until he sells the property, contrary to the agreement.

After closing, Cross further acted as the consultant for the hotel, helping in hiring people, placing an assistant manager into position, helping to make repairs and labors, all as part of the entire agreement regarding the purchase of the motel. He also worked at the Cozy Inn location; the BBQ building; helped clean the residence of 39 Mateer Drive to allow rental, and assisted on Irwin's house.

On or around 2 months after the purchase and closing finalized, Defendant Cross went to Plaintiff Jefferson County Title Company to obtain a copy of the Settlement Sheet, for he misplaced his original. When entering, he asked an agent for Plaintiff Jefferson County Title Company as to the document, who at first would not perform until Defendant Cross explained he signed the document and held a right to it; after speaking to someone in the back room, the lady agent looked for the Settlement Sheet in the file and stated it was not there, looked around and it was laying on a desk. Defendant Cross asked why it was not in the file and was informed "it is being updated." Defendant Cross received a copy but did not pay much attention to it at this time.

Later, Defendant Cross located the original and compared the Settlement Sheets; the second, received after closing from Plaintiff Jefferson County Title Company, was different, where it now stated: 1) Contract Sales Price: $2,100,000.00; 2) Personal property: $100,000.00; 3) Buyer's expenses: $214,048.00; and the working capital was now blank. This is believed was done to allow Irwin to transfer the funds out of state. Further, the entire row under Summary of Seller's Transactions was now empty, holding no figures. Defendant Cross believes this is what the "it is being updated" represented, was the alteration of closing documents by Plaintiff Jefferson County Title Company on behalf of Plaintiff Irwin, probably at the direction of People's National Bank.

The Plaintiff, Jefferson County Title Company indicates plainly Defendant is owed a commission on $2,100,000.00 for negotiating sale, consulting, labors and advising the purchase, repairs and operation of the hotel at 405 South 44th Street, Mount Vernon, Illinois. The extra $10,000.00 was an error where furniture is not part of the transaction.

Randall Irwin refused to listen to Cross, and removed the Americas Best Value signage, contrary to agreement with the Vantage agent, which caused Vantage, out of Florida to file a civil suit which included Cross as a party. Cross filed a transfer of venue, which the attorney hired dismissed with right to refile. Cross also filed a civil action against Vantage and local party.

Cross asked to be paid and Irwin refused. Irwin contended he didn't owe anything. He contended if anything he only owed $20,000.00. Irwin had stated many matters of which his statements would alter and change for they were never honest or upfront. Cross learned a lawyer in Mt. Vernon had to sue to get his funds, and a businessman in Salem held Irwin a liar and a person that would try to cheat people to keep his money, even for work done. Cross had concerns of being paid and filed liens to Protect himself on the properties.

As indicated in the lien, the Patels were going to pay the larger commission, with Mr. Irwin only liable for $50,000.00, however, because Mr. Irwin refused to accept the motel for $2,400,00.00 and requested a further departure, Mr. Irwin instructed he would take care of the complete commission if Patels' would accept the lower price of $2,200,000.00 which they did, making Mr. Irwin responsible for the entire commission based on $2,100,000.00, where Defendant's normal fee is 10% of the purchase/sale price.

6

That after purchase of the Hotel for Plaintiff Randall Irwin and NVK Properties, Defendant Cross went to Memphis Tennessee to see a friend for a loan based on the terms of the agreement that by May 1, 2015 Defendant Cross would be paid his commission. The friend, Bufford Hunter, loaned Defendant $50,000.00 at 5% interest to be repaid by June 1, 2015 from the payment of the commission. This was all contingent upon Defendant's payment from Plaintiff Irwin for the commission owed for his services and helping to improve the property.

Plaintiff Irwin made the claim based on the allegation he did not believe he could not get the $2,200,000.00 and would be lucky to obtain this, and could not get the $2,400,000.00 because the property value was not there from Plaintiff People's National Bank. It's worth noting the "Purchase and Sale Agreement" with the Patels' makes plain Defendant was the agent and seller for both MPK Investment, Inc. and NVK Properties, LLC, both Irwin and the Patels.

It's alleged Plaintiff, Irwin is partners or venture co-partners in relation to business transactions, where Plaintiff Irwin is president of Midsouth Property Holdings, Inc. in Salem, Illinois, and Plaintiff Michael P. Holtz is President of MPH Hotels, Inc. out of Florida, but both have ownership in Plaintiff Salem, IL 0614 LLC as shown by the Illinois' Secretary of State web site. The site also indicates plainly that MPH Hotels Inc. and MidSouth Property Holdings Inc. are the primary owners of Plaintiff Salem IL, 6014 LLC, and the owners of these two properties are Plaintiff Randall Irwin for MidSouth Property Holdings and Plaintiff Michael Holtz for MPH Hotels Inc., the same parties who signed the Plaintiff Salem IL, 0614 LLC mortgage. Notably, the Building Permit for the Salem IL 0614 LLC property was obtained by MPH Hotel's agent Randy Gibbons from Florida.

It's alleged, Plaintiff Irwin informed Plaintiff People's National Bank for the mortgage loan on the Mount Vernon Property it was to pay part of the commission to Defendant and help repair

7

and operate the hotel property at 405 South 44th Street, Mount Vernon, Illinois. Documents show Plaintiff Irwin had $225,891.21 in the business account which is from the $2,440,000.00 for the property loan, later reduced to $11,712.82 because of transfer from mortgage property to the Salem IL, 0614 LLC property.

When this amount dropped, Irwin went to Florida with the funds for his partner, Holtz, to purchase stock in the Salem, Illinois, Holiday Express hotel being built. Because of Irwin's repeated trips to Florida during a year's time frame, it is also believed there could be drug activity involved. Irwin usually claims before a trip he has no funds; after the trip, he pays bills. A State officer mentioned when Irwin's son died, by suicide, from Heroine usage, they believed Randall Irwin senior had something to do with the Heroine dealing, but could not prove it then.

It is contended Plaintiff People's National Bank, via agent Brian Gansauer, bank officer; (Officer receiving kickback from Irwin), Plaintiff Jefferson County Title Company; Plaintiff Irwin and Plaintiff Holtz, worked in agreement with each other, knowing the original Settlement Sheet required the extra funds to be working funds for only the Mount Vernon Property, to alter and commit criminal offense of fraud to change the original Settlement Sheet into the altered Settlement Sheet, to allow Plaintiff Irwin to have access to transfer the extra funds for the benefit of Plaintiffs Holtz and SALEM, IL 0614 LLC into the Salem property, by having Plaintiffs Jefferson County Title Company and People's National Bank work in concert with them to manipulate the Settlement Sheet to allow the transfer of funds by mortgage fraud, also called money laundering. When this was done, Irwin transported the funds to Florida, and from there the funds entered into the SALEM IL 0614 property stock in Salem Illinois.

Irwin makes regular trips from Illinois to Florida. Before making the trips Irwin complains of lacking funds; after each trip he seems to have funds to pay bills and expenses.

Cross believes, but cannot prove, this is due to drug actions. Irwin drives a dark blue Hummer, which is used for these trips.

Irwin had Mr. Skurdal hire a man named James Johnston, an ex-felon for drug charges, and friend of his dead son as employee at the Hotel. Johnston was allowed to buy and repair rooms Irwin would never allow Skurdal, as manager, to do. Eventually, Johnston was made manager, and Skurdal was removed from that position. Johnston had many connections from his drug sales, and could buy items cheap, where it is believed the items were probably stolen, like lap tops, tools, etc. Johnston also has his girlfriend, a heroine user, supposed to go to rehab, but always remains around him instead. He makes a big issue how he's against drugs; works with local detectives and police, yet allows marijuana to be sold, and it is believed is tied to other drugs, but cannot be proven.  Skurdal was eventually fired. The hotel is known for it being filled with drug users, majority of rooms being rented weekly, like an apartment.

In 2016, Irwin travelled back and forth between Mount Vernon and Florida over 4-5 times during the year. In 2016, to Cross' knowledge, Irwin's gone 1-2 times already. Why?

Facts are only partial for a review. The complaints set forth the facts more thoroughly. Cases are: _Salem IL 0614 LLC v. Cross_, No: 15-CH-53 (4th Judicial Circuit, Marion County, Dec. 09, 2015), on appeal, 5-16-0258 (5th District, Dec. 13, 2016); and _NVK Properties, LLC and Irwin v. Cross and Cross_, No: 15-CH-62 (Second Judicial Circuit, Sept. 14, 2015), appeal dismissed due to Cross' inability to obtain records. Also, _Cross v. Irwin, et al._, No 17-CV-34-JPG-RJD (USDC S.DIST. ILL) which was dismissed because of inability to show juridical authority for the court to hear the case. This can be viewed on PACER with more detailed facts and documents, including the altered settlement sheets. Further facts can be reviewed through these cases.

Much of Cross' problems, over charges, stem from not being paid by Irwin, and banks and state officials bringing charges against him.

In Greenville, Illinois, Cross was interested in a property. The bank suggested, instead, Cross buy a bar that was closed, obtained by the bank. Cross agreed. The bank was to issue a mortgage deed for the lender out of California. Cross and Skurdal signed the loan documents, with Skurdal (having knowledge of the UCC and banking laws) reserving his rights by signing "Reserving all rights" above his signature on the bank account documents, the loan papers, and on various checks he was asked to sign relating to the loan.

The bank never issued the mortgage deed for the lender, but the Greenville bank stated, even in front of Skurdal, the money was there and Cross obtained cashier checks of various amounts for the loan and other matters, around $100,000.00 plus or minus. These checks allegedly bounced, because the lender withdrew the funds because the mortgage deed had not issued. The bank had Cross come down to discuss the problem and was informed they needed to turn over the mortgage deed but the bank was hesitant. Although they could have required the lender to guarantee the check for exchange of the mortgage deed, or make the mortgage contingent on recent of the funds when issued, the bank did nothing. They called Cross back and had him arrested, with Cross' brother helping to bail him out for $50,000.00.

The account was in Skurdal's name and the banker had been informed when it was opened that Skurdal was in Mount Vernon at the Affordable Inn hotel. That because it was temporary, a different address was given for the account, but the bank officer had knowledge of Skurdal's dwelling location. The bank sent things to Montana, but never to Mount Vernon. Skurdal was never given notice to allow remedy of the problem as set by the Baker's Hand book

10

and UCC standards. Instead, they just arrested Skurdal, at the Affordable Inn, believing he could also put up a large bail, but Skurdal is a poor man without ability for bails.

Skurdal got an OR bond because of medical and his filings in jail. Skurdal was arguing the bank loan was actually paid, except for about $3-4,000.00 because each check and mortgage documents, being signed by reservation, when the bank failed to give notice and time to correct, cancelled those checks out under the UCC. Since the largest check, signed by Cross, and the loan monies, was contingent on the mortgage papers, and Skurdal signed these by reservation also, as well as his account the funds went through, these checks were also cancelled. The bank nor state officials would recognize this matter.

Cross was concerned about jail and appeals, so he agreed to plead guilty in exchange for Skurdal being dismissed. Skurdal wanted to fight because he believed he could win. Skurdal was to have a probable cause hearing, but Cross' plea cancelled this, so whether the case might had been dismissed was never known. However, when the Court had Skurdal come forth to have him dismissed, and the prosecutor informed the court of the plea and terms, the prosecutor turned around to face the banker behind him and asked the banker "is that what you wanted? Is this okay with you?" and solely because of the banker's statements the process proceeded and Skurdal was dismissed, and Cross found guilty. The banker controlled the court process, and the prosecutor always spoke to the judge in chambers before each hearing without Skurdal or Cross' presence.

Skurdal could inform the UCC authority and explain why he believed he could win the case if needed. He stated he would explain if requested.

11

Kentucky Matter!

I took a person to buy this foreclosed piece of real estate!

I never signed anything with this bank, the bank account in question was not mine or did I have any interest in such account!

"Regard To Kentucky"

Being in business of the sale of Foreclosed Troubled Real Estate, I handled the sale of a foreclosed/bank owned piece of real estate. (copy of contract attached)

The lady who was purchasing said real estate was in the business of designing web sites, and related business.

Although, originally from Illinois, she had done a lot of business in Paducah, Ky. in the arts and such.

In the starting of her business, I found her the foreclosed real estate, bank owned.

She opened a business checking account at the bank, transferring funds from her Illinois checking account. Originally, when she executed a check to pay for the building, a deposit, she was advised her funds was in her account. She was later told the check was returned.

My only business with her was helping on the sale of the real estate, get her a office. I never sign any documents, accounts or otherwise. I never was paid or given money!

*THIS WAS NOT ACCOUNT!*

**Cc:** KATHY PARKER; MICHAEL RADCLIFFE; JENNIFER CLONINGER; LESLIE EVANS; RANDELL BLACKBURN; TODD MYERS; SUSAN YBARZABAL; ALEXANDRA S. LANSDEN
**Subject:** RE: Bluegrass Commercial Investments

Michael pulled her credit this morning, it is attached. Chexsystems didn't show anything when I opened the account.

**From:** JASON E JONES
**Sent:** Wednesday, August 24, 2016 11:02 AM
**To:** CHASE BOHANNON
**Cc:** KATHY PARKER; MICHAEL RADCLIFFE; JENNIFER CLONINGER; LESLIE EVANS; RANDELL BLACKBURN; TODD MYERS; SUSAN YBARZABAL; ALEXANDRA S. LANSDEN
**Subject:** Re: Bluegrass Commercial Investments

I think that would be good. Because, at this time, we do have an unsecured loan I think we should run a credit report.

What did the Chexsystems report show?

*Note: The bank acknowledges, when that check was returned unpaid, it becomes a unsecured loan. There was given instant credit upon deposit. This is a civil matter, not criminal.*

Sent from my iPhone

On Aug 24, 2016, at 10:58 AM, CHASE BOHANNON <CHASEB@cfsvcs.com> wrote:

> I can call them back and get the gentleman's information if you think I should.
>
> **From:** JASON E JONES
> **Sent:** Wednesday, August 24, 2016 10:58 AM
> **To:** CHASE BOHANNON
> **Cc:** KATHY PARKER; MICHAEL RADCLIFFE; JENNIFER CLONINGER; LESLIE EVANS; RANDELL BLACKBURN; TODD MYERS; SUSAN YBARZABAL; ALEXANDRA S. LANSDEN
> **Subject:** Re: Bluegrass Commercial Investments
>
> Can you talk to the investors and get some information from them?
>
> Sent from my iPhone
>
> On Aug 24, 2016, at 10:52 AM, CHASE BOHANNON <CHASEB@cfsvcs.com> wrote:
>
> > Another option for when they are with the investor in Memphis is for him to wire the funds directly to us, with me giving him the information directly over the phone. They are going to call me when they meet with him tomorrow.
> >
> > **From:** CHASE BOHANNON
> > **Sent:** Wednesday, August 24, 2016 10:51 AM
> > **To:** KATHY PARKER; MICHAEL RADCLIFFE; JENNIFER CLONINGER; JASON E JONES; LESLIE EVANS; RANDELL BLACKBURN; TODD MYERS; SUSAN YBARZABAL; ALEXANDRA S. LANSDEN
> > **Subject:** Bluegrass Commercial Investments
> >
> > Hi everyone,

3

*I helped the bank in selling this foreclosed Real Estate to the party executing this document.*

## Real Estate Purchase Contract

The undersigned Buyer(s) (whether one or more, hereinafter collectively called the "Buyer") offers to purchase from the Seller(s) (whether one or more, hereinafter collectively called the "Seller") the following described property, with all improvements and appurtenances thereunto belonging known as

2021 Ky. Ave Paducah Ky. 42001

and further described in Deed Book 1175, page 286, County of McCracken, State of Kentucky (the "Property").

1. PURCHASE PRICE:  The purchase price for the property shall be the sum of $46,000.00

2. DEPOSIT:  An earnest money deposit has been paid to seller in the amount of $1000.00, pending payment in full or buyer obtaining financing for payment of said contract.

3. MORTGAGE:  Buyer agrees to apply for and use Buyer's best efforts to obtain a fixed/adjustable rate mortgage loan.  Buyer shall pay all closing costs unless otherwise stated in this purchase contract.

4. PROPERTY INCLUDED:  The term property as herein used shall include all fixtures such as shades, screens, linoleum, wall-to-wall carpet, storm doors and windows, curtain roads, lighting, heating and plumbing equipment, if any, plus all articles so attached or built in which, if removed, would leave premises in a damaged, incomplete or unfinished condition, plus the following:

5. DEED:  At closing, upon the purchase being paid as provided in Paragraph 1, hereof, an encumbered marketable title to the property shall be conveyed to Buyer by deed of general warranty with the usual covenants such as any national title company will insure, free and clear of all liens and encumbrances except (I) such liens and encumbrances as Buyer may specifically approve; (II) restrictions imposed by the Planning and Zoning Commission and (III) easements of record and all restrictions as to the use and improvement of the Property of record. Should the title to the property appear defective, Seller shall have thirty (30) days after receipt of notice from Buyer of such defect(s) within which to remedy same of cost of Seller.

6. CLOSING COSTS:  Seller shall pay the transfer tax for the deed, and for preparation of the deed, and Buyer shall pay for the opinion of title, unless such title shall be defective and such defect is not remedied by Seller, in which case Seller shall reimburse Buyer for Buyer's actual cost incurred for such title opinion.

7. PRORATIONS: Rents, if any, are to be prorated as of the date of closing security deposits or advance rents, if any, shall be credited to Buyer as of the date of closing. All real estate and valorem taxes due and payable during the year of closing shall be prorated on a calendar basis, regardless of the date upon which such taxes were assessed, or the date which may be set forth on any tax bill therefore. In the event ad valorem taxes for the year of closing are unavailable or unascertainable, then the ad valorem rate for the preceding year assessment shall be considered as a basis for prorations.

8. CLOSING: This transaction shall be closed on or before 9/19/2016.

9. POSSESSION: Possession of the property shall take place day of deed, or 9/20/2016.

10. RISK OF LOSS OR DAMAGE: All risk of loss or damage to the property by fire, windstorm, casualty, or other cause shall remain with Seller until date of closing. If the property is destroyed or materially damaged by any of the aforementioned, this contract shall be null and void at the option of the Buyer.

11. SELLER WARRANTIES: Property is being sold "as is, where is".

12. ENTIRE AGREEMENT: Buyer and Seller have read the entire contents of this contract, agree that all terms and conditions pertinent hereto are included in this writing, and agree that no verbal agreements or understandings of any kind shall be binding upon the parties.

13. ACCEPTANCE OF CONTRACT: Upon sellers acceptance of this Contract by their signatures, this Contract shall be in full force and effect.

14.    INSPECTIONS. This Contract and Buyer's obligation to close the sale transaction contemplated herein is specifically contingent upon Buyer's satisfaction of each of the following contingencies (the "Contingencies"), any or all of which may be waived by Buyer in writing to Seller on or prior to 5:00 p.m. Central Time on that date which is thirty (30) days after the date of this Contract (the "Contingency Period"). Buyer shall have until 5:00 p.m. Central Time by the end of the Contingency Period to take the following actions:
a)       Environmental Assessment. To review and approve any and all environmental inspections or reports which Buyer may obtain of the Property at Purchaser's sole cost and expense;
b)       Physical Condition. To review and approve the physical condition of the Property;

c)     Zoning.  To determine that Buyer's intended use of the Property is allowed under its current Zoning and other land use rules and regulations; and

d)     Flood Plain Determination.  To determine that the Property is not within a flood plain or that the Property is situated at an acceptable elevation within a flood plain that will not interfere with Buyer's intended use of the Property or Buyer's ability to finance or re-sell the Property.

During the Contingency Period, Buyer or Buyer's agents may enter upon the Property, and Seller shall grant them access to the Property at all reasonable times and upon reasonable prior notice for purposes of conducting inspections, surveys, test, studies and other investigations provided for herein.  Buyer agrees to repair any physical damage at its expense done to the Property to Seller's satisfaction with respect to the foregoing.  Buyer shall indemnify and hold harmless Seller with respect to any and all loss, claim, injury or other damage resulting from the inspections, surveys, tests, studies and other investigations provided for herein and from all testing and liens that may result from such testing.  The provisions of this paragraph shall survive termination of this Contact.

In the event that any of the results of the above described inspections or matters are not satisfactory to Buyer in Buyer's sole discretion, then Buyer may by written notice given to Seller within the Contingency Period notify Seller of the termination of this Contract and of those conditions which are unacceptable to Buyer, whereupon this Contract shall become null and void and of no further force or effect and all Earnest Money shall be promptly returned to Buyer.  If Buyer fails to terminate the Contract as aforesaid on or prior to the end of the Contingency Period, such failure shall be deemed a satisfaction of the conditions set forth above and notice of Buyer's intent to continue this Contract and waive the Contingencies.

Accepted this 19ᵗʰ day of August, 2016.

BUYER

Bluegrass Comercal Investments

SELLER

CFSB

BY:

# Suspect in baby's broken leg takes plea agreement

**BY KAT RUSSELL**

krussell@paducahsun.com

A Paducah man accused last year of breaking an infant's leg could serve up to eight years in prison after accepting a plea agreement Tuesday in McCracken Circuit Court.



**Ragan**

Kelton Ragan, 19, pleaded guilty to first-degree criminal abuse of a child less than 12 years of age, a felony punishable by up to 10 years in prison. The Commonwealth Attorney's Office has recommended a sentence of eight years.

Assistant Commonwealth Attorney Leigh Ann Dycus said Ragan would be eligible for parole after serving 20 percent of his sentence and he would not be eligible for probation or "good time credit."

"Child abuse will not be tolerated in McCracken County," Dycus said following the hearing. "Innocent children should never be subjected to this type of violence. Mr. Ragan is going to prison where he can't hurt any other children and the baby is in a safe environment now."

Ragan was arrested Nov. 14 after a Baptist Health Paducah staff member contacted the Kentucky State Police to report a 3-month-old baby had been brought to the emergency room with a fractured femur.

Detective Eric Fields testified during Ragan's preliminary hearing on Nov. 23 that medical staff had also found evidence of an old rib fracture on the child's X-rays.

Fields said he interviewed Ragan who stated the child had woken early that morning and needed attention. Ragan told police he had "picked the child up out of the crib by the legs," and "felt something snap," the trooper said.

The mother, Fields said, didn't realize something was wrong until she was handed

*Please see* **RAGAN** | 3A

**CONTINUED FROM 2A**

the child and she felt the baby's leg.

After being treated at Baptist Health Paducah, the detective said, the child was transferred to Kosair Children's Hospital in Louisville.

Following the interview with the parents, Fields said, police went to a North 23rd Street residence where the couple and baby were staying. Four other people, including Ragan's sister, lived in the house, he said.

Fields said investigators interviewed Ragan's sister, who said she stated she had "heard a loud squeal" that morning that was different from the child's typical cries.

Fields also described conditions in the house, stating there were "holes in the dry wall that had been caused by previous altercations between Mr. Ragan and the child's mother." The detective added there was clothing and trash "piled up" around the baby's crib.

Overall, Fields said, the child's injuries and the living condition inside the house indicated "that there needs to be

some social services provided," to ensure the baby was properly taken care of.

The combination of the child's injuries and the condition of the house, Fields said, showed "the pattern of the care the child has received."

Ragan's sentencing has been scheduled for July 24.

RAGAN **Bond Issue!**

WEDNESDAY, March 22, 2017

www.paducahsun.com

# The Paducah Sun

Vol. 121 No. 81

THE TOP DOG: Labrador retrievers again most popular. | 8A



Thursday and Friday at its office, 5470 U.S. 60 West, across from Tractor Supply.

*(handwritten annotations: "This guy is out on bond! Abuse of a Baby!")*

*(handwritten at bottom: "This person breaks a babys leg, + other abuse, out running around! Something wrong")*